Kristen L. Martini, Nevada Bar No. 11272
Lucy Crow, Nevada Bar No. 15203
LEWIS ROCA ROTHGERBER CHRISTIE LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Tel:   702.949.8200
Fax:   702.949.8398
One East Liberty Street, Suite 300
Reno, Nevada 89501
Tel:   775.823.2900
Fax:   775.823.2929
Email: kmartini@lewisroca.com
       lcrow@lewisroca.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| GOLDEN PEAR FUNDING OPCO, LLC, a Delaware limited liability company; and LITICOLLECT, LLC, a Delaware limited liability company,<br><br>          Plaintiffs,<br><br>v.<br><br>KO CASE SUPPORT, INC., a Nevada corporation; INJURY MEDICAL DIRECTORY, INC., a California corporation; and DOES I-X, inclusive,<br><br>          Defendants. | Case No.: 2:23-cv-01670<br><br>**COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

i

122672531.1

COMES NOW Plaintiffs Golden Pear Funding OpCo, LLC, and LitiCollect, LLC (together, "Plaintiffs"), and complain against Defendants KO Case Support, Inc., and Injury Medical Directory, Inc. (together, "Defendants"), as follows:

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff Golden Pear Funding OpCo, LLC ("Golden Pear"), is a Delaware limited liability company with its principal place of business in Jersey City, New Jersey. None of the members of Golden Pear reside in California or Nevada. Plaintiff LitiCollect, LLC ("LitiCollect") is a Delaware limited liability company with its principal place of business in Jersey City, New Jersey. None of the members of LitiCollect reside in California or Nevada. Defendant KO Case Support, Inc. ("KO"), is a Nevada corporation with offices located in Clark County, Nevada. Defendant Injury Medical Directory, Inc. ("IMD"), is a California corporation. Upon information and belief, none of the members of KO or IMD reside in New Jersey or Delaware. Therefore, jurisdiction is proper as there is complete diversity of citizenship between the parties to this action as required by 28 U.S.C. § 1332(a) and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

2. This Court has personal jurisdiction over Defendants, and each of them, because the acts and omissions complained of herein were committed, in part, within the State of Nevada, County of Clark, and, thus, Defendants, and each of them, had and continue to have sufficient minimum contacts with this forum such that the exercise of personal jurisdiction over them will not offend traditional notions of fair play and substantial justice.

3. Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because all of the actions alleged herein were undertaken in this district, and affect property located in Clark County, Nevada.

4. As detailed further below, the operative agreements giving rise to this Complaint each contain provisions providing for the application of the law of the State of New York. Therefore, substantive New York law governs this dispute.

/ / /

/ / /

1

122672531.1

**THE PARTIES**

5. Plaintiff Golden Pear is a Delaware limited liability company, in the business of providing financial solutions to law firms, medical providers, and plaintiffs with personal injury cases.

6. Plaintiff LitiCollect is a Delaware limited liability company that provides financial collection services, including collecting amounts owned for medical liens related to personal injury lawsuits. LitiCollect is an affiliate of Golden Pear, and Golden Pear regularly contracts LitiCollect to service accident receivables on behalf of Golden Pear.

7. Defendant KO is a Nevada corporation with offices located in Clark County, Nevada, and with the center of KO's direction, control, and coordination being in the State of Nevada. KO is a litigation financing and servicing company that is in the business of financing personal injury lawsuits and servicing medical liens for personal injury lawsuits.

8. Defendant IMD is a California corporation that classifies itself as a consulting company and maintains multiple medical facilities that it services.

9. Defendants KO and IMD are related entities with shared leadership. The President and Director of KO is Ramin Ray Shaolian. The Chief Executive Officer, Secretary, and Chief Financial Officer of IMD is also Shaolian.

10. Upon information and belief, KO and IMD also have shared ownership.

11. Plaintiff alleges that Defendants named herein as Does I through X are individuals, corporations, limited-liability companies, partnerships, associations, or other persons or entities who are responsible in some manner or capacity for the acts alleged herein, but whose names are unknown to Plaintiff at this time. Plaintiff will seek leave to amend this Complaint to include the names of Does I through X when the identities of such defendants become known to Plaintiff.

**GENERAL ALLEGATIONS**

**I.      PLAINTIFFS AND DEFENDANTS ENTER INTO MULTIPLE AGREEMENTS**

12. Golden Pear directly funds personal injury litigation. Golden Pear also purchases rights, title, and all interests in medical accounts receivable generated by medical providers who have provided services to personal injury plaintiffs and who have medical liens. Once Golden Pear

122672531.1

purchases an account receivable, that account receivable becomes an asset to Golden Pear and is owned by Golden Pear. Once the plaintiffs' personal injury claims are resolved, the proceeds from the medical liens associated with the personal injury cases are then paid to the owner of the medical receivables, like Golden Pear. For its purchased accounts, Golden Pear occasionally contracts with a servicing company to monitor and collect the accounts receivable from law firms and plaintiffs with personal injury cases.

13. LitiCollect is an affiliate of Golden Pear that provides financial collection services, including: monitoring accounts receivable from law firms and plaintiffs with personal injury cases; coordinating with medical providers, and those law firms and plaintiffs with personal injury cases; and collecting funds owed from law firms and plaintiffs with personal injury cases.

14. KO purchases and sells medical accounts receivable, including those generated in connection with plaintiffs who have personal injury cases. KO also services accounts receivable by monitoring and collecting accounts receivable from law firms and plaintiffs with personal injury cases.

15. IMD owns and maintains a network of medical providers who offer services to plaintiffs with personal injury cases and work on a lien basis in California, Nevada, and Arizona.

16. KO and IMD are closely related entities with overlapping leadership and, upon information and belief, overlapping ownership. Further, upon information and belief, IMD and KO exercised complete dominion over each other with respect to the transactions and agreements at issue herein that were used to commit a wrong upon Plaintiffs.

17. Between October 15, 2021, and February 7, 2023, the parties voluntarily entered into various agreements involving two or more of the parties to this action. Those valid and binding agreements consist of the following: (A) the October 15, 2021, Medical Accounts Receivable Master Purchase and Sale Agreement ("Master Purchase Agreement") between Golden Pear and KO, attached and incorporated as though fully set forth herein as **Exhibit 1**; (B) several Sale and Purchase Agreements ("SPA" or "SPAs") entered into from December 1, 2021, to February 7, 2023, between Golden Pear, on the one hand, and KO or IMD, on the other hand; (C) the November 5, 2021, Servicing Agreement ("Servicing Agreement") between Golden Pear and KO, attached and

- 3 -

122672531.1

incorporated as though fully set forth herein as **Exhibit 2**; and (D) the February 7, 2022, Servicing Agreement ("Sub-Servicing Agreement") between Golden Pear, KO, and LitiCollect, attached and incorporated as though fully set forth herein as **Exhibit 3**.

### A. The Master Purchase Agreement

18. On October 15, 2021, Golden Pear and KO entered into the Master Purchase Agreement, under which Golden Pear, was the "Purchaser," and KO, was the "Seller" for accounts receivable over a period of time, which accounts receivable would be specifically identified and purchased through separate SPAs. *See generally* **Ex. 1**.

19. Because IMD was the original owner of the receivables by way of its ownership of the medical facilities, and KO was IMD's de facto servicer and IMD's seller of the accounts, the parties had understood that any receivables purchased by Golden Pear from IMD and/or KO would have already been assigned to KO from IMD. While IMD is not a party to the Master Purchase Agreement, upon information and belief, IMD was aware of and working in conjunction with KO in entering into the Master Purchase Agreement to facilitate IMD's sales of its accounts receivable.

20. Recital I of the Master Purchase Agreement defined these accounts receivable as "Accident Receivables," and Golden Pear agreed to purchase them from KO on a reoccurring basis. *Id.* at 1, Recital I.

21. Each Accident Receivable was purchased individually, and a purchased Accident Receivable was defined as a "Purchased Receivable." *Id.* at 2 § 2(a).

22. Section 2(e) of the Master Purchase Agreement contains several provisions for the benefit of Golden Pear as the owner of the Purchased Receivables. *Id.* at 2-3 § 2(e)

23. As to Golden Pear's ownership interest in the Purchased Receivables, the parties agreed in Section 2(e) that KO is "deemed to have assigned and transferred to [Golden Pear] all of [KO]'s present and future right, title and interest in, to and under the Purchased Receivables and any penalties or interest due thereon." *Id.* at 2-3 § 2(e).

24. Related to its ownership interest in the Purchased Receivables, Section 2(e) enumerates Golden Pear's "sole and exclusive right[s]," reading:

- 4 -

> [Golden Pear] shall have the <u>sole and exclusive right</u> to: (a) demand and receive payment obligations represented by the Purchased Receivables from the owing party; (b) issue payment instructions with respect to the obligations represented by the Purchased Receivables; (c) enforce any security interest or other rights granted to the [KO] in connection with the Purchased Receivables and to pursue any rights or remedies against the party obligated with respect to the Purchased Receivables; (d) [Golden Pear] may choose to file its own UCC statements to protect its rights with respect to the Purchased Receivables.

*Id.* at 2-3 § 2(e).

25. In conjunction with Golden Pear's sole and exclusive rights, Section 2(e) provides that Golden Pear is "solely responsible for all pursuit and collection efforts with respect to the Purchased Receivables" subject to KO's "obligation to share records relating to the Purchased Receivables." *Id.* at 2-3 § 2(e).

26. Accordingly, Section 2(e) directs that KO is required to cooperate with Golden Pear when Golden Pear notifies "the party obligated under each Purchased Receivable (the "Obligated Party") that [Golden Pear] has acquired all of [KO]'s rights to such Purchased Receivable and that all notices relating to such Purchased Receivable shall be sent to [Golden Pear] at an address provided in such notice." *Id.* at 2-3 § 2(e).

27. Under Section 2(e), KO also "agree[d] to sign promptly all such other documents, and take all such further actions, as [Golden Pear] may reasonably request from time to time to evidence the transfer of ownership of the Purchased Receivables." KO was also required to "promptly forward any notice, request, offer or similar communication or pleading with respect to a Purchased Receivable . . . to [Golden Pear]." *Id.* at 2-3 § 2(e).

28. Under the Schedule A attached to the Master Purchase Agreement, once the Accident Receivable was collected, the collection proceeds were to be distributed between Golden Pear and KO on a waterfall basis. *Id.* at Ex. A.

29. The term of the Master Purchase Agreement was set to expire one year from October 15, 2021, but could be enlarged by one year each time Golden Pear purchased an Accident Receivable. *Id.* at 2 § 2(b).

122672531.1

**B.     The Sale and Purchase Agreements**

30.     Between from December 1, 2021, and February 7, 2023, Golden Pear purchased hundreds of Accident Receivables from either KO or IMD. For the Accident Receivables that Golden Pear purchased from IMD, Golden Pear purchased them directly from IMD. In other words, IMD did not assign the Accident Receivables to KO where KO would then sell those Accident Receivables to Golden Pear as contemplated by the parties.

31.     Each time that Golden Pear purchased a set of Accident Receivables from either KO or IMD, Golden Pear entered into a separate Sale and Purchase Agreement ("SPA") with either KO or IMD. Golden Pear never entered into any SPA with both KO and IMD together.

32.     Each SPA is substantially identical with the exception of the specific "Purchased Receivables," which are defined as the Accident Receivables set forth in the Schedule A attached to each SPA. Schedule A of each SPA lists the patient names, the total amount of billed charges, and the total amount of paid charges that comprise the Purchased Receivables.

33.     Under all of the SPAs, Golden Pear was identified as the "Purchaser" of the Purchased Receivables, and KO or IMD was identified as the "Seller" of the Accident Receivables-turned-Purchased Receivables.

34.     Through each of the SPAs, KO and IMD assigned all rights to the Purchased Receivables to Golden Pear and generally agreed to cooperate in Golden Pear's collection of those Purchased Receivables.

35.     Specifically, once Golden Pear purchased the Accident Receivables, Golden Pear acquired all rights, titles, and interests in the Purchased Receivables under Section 2(a) of the SPAs. Section 2(a) of the SPAs provides that "the Seller agrees to sell, transfer, set over and assign to Purchaser and Purchaser agrees to buy from the Seller, all right, title, and interest . . . of the Seller to the payment of all sums owing or to be owing with respect to those Accident." Section 4 of the SPAs similarly provides, "[T]he sale and purchase of the Purchased Receivable hereunder shall constitute an absolute and irrevocable true sale for all purposes under applicable law and accounting principles," and "[Golden Pear] shall have the full benefits and burdens of ownership of each Purchased Receivable."

122672531.1

36. Section 2(c) of the SPAs, like the Master Purchase Agreement, provides that Golden Pear shall have "the sole and exclusive right to: (a) demand and receive payment obligations represented by the Purchased Receivables from the owing party; (b) issue payment instructions with respect to the obligations represented by the Purchased Receivables; (c) enforce any security interest or other rights granted to the Seller in connection with the Purchased Receivables and to pursue any rights or remedies against the party obligated with respect to the Purchased Receivables; [and] (d) Purchaser may choose to file its own UCC statements to protect its rights with respect to the Purchased Receivables."

37. KO and IMD expressly "acknowledge[d] the right of the Purchaser to take such steps as it deems necessary to collect amounts due with respect to the Purchased Receivables" under Section 2(d).

38. Related to Golden Pear exercising its SPA Section 2 rights, Section 5 required the Seller, either KO or IMD, to "cooperate as reasonably necessary to permit Purchaser [Golden Pear] to collect on the Purchased Receivables." This "duty to cooperate" expressly required that if a personal injury law firm or plaintiff sent payment directly to KO or IMD, then they "shall hold such payment, instrument, chattel paper or other proceeds in trust for the Purchaser and promptly turn over the same to Purchaser in the form received." The "duty to cooperate" also required KO or IMD to make available all "records and such other documentation as are necessary for Purchaser to collect the Purchased Receivable."

39. Not only were KO and IMD required to promptly send these payments to Golden Pear, but, under Section 2(c) of the SPAs, KO and IMD were also required to "promptly forward any notice, request, offer or similar communication or pleading with respect to a Purchased Receivable . . . to Purchaser."

40. In addition to these duties, KO and IMD made several warranties and representations under Section 3(b) of the SPAs, including that "[t]he Seller has good title and authority to transfer and assign each Purchased Receivable to the Purchaser," and "the Seller does not owe any obligations to any party obligated to pay a Purchased Receivable that entitle such party offset, defense or counterclaim against payment of any Purchased Receivable."

- 7 -

122672531.1

41. Lastly, in Section 12, the parties agreed that each SPA "shall be governed and construed in accordance with the laws of the State of New York without giving effect to conflicts of law principles that would cause the application of the law of any jurisdiction other than the laws of the State of New York."

42. Consistent with the Master Purchase Agreement, Golden Pear entered into 6 SPAs with KO and 45 SPAs with IMD. The last SPA with KO was entered into on July 7, 2022, and the last SPA with IMD was entered into on February 7, 2023.

### C. The 2021 Servicing Agreement

43. Three weeks after entering into the Master Purchase Agreement, and one month before entering into the first SPA, Golden Pear and KO entered into the Servicing Agreement on November 5, 2021, whereby Golden Pear elected to use KO's services in monitoring, negotiating, and collecting payment with law firms or plaintiffs for the Purchased Receivables that Golden Pear bought through the SPAs. *See generally* **Ex. 2**. While IMD is not a party to the Servicing Agreement, upon information and belief, IMD was aware of the Servicing Agreement when Golden Pear and KO entered into it.

44. The Servicing Agreement defined Golden Pear as the "Owner" of the Purchased Receivables. *See* **Ex. 2** at 1. The Servicing Agreement defined KO as the "Servicer" for the Purchased Receivables. *Id.* The parties defined "Purchased Receivables" as the Accident Receivables purchased by Golden Pear pursuant to SPAs and the Master Purchase Agreement. *Id.* at 1 § 1.1(a). Under the Servicing Agreement, KO was generally required to provide collection services for the Purchased Receivables, including managing, supervising, and directing collections of the Purchased Receivables on behalf of Golden Pear. *See generally* **Ex 2**.

45. Although the Servicing Agreement was not terminable without cause, the parties listed several events of default that would permit Golden Pear to terminate the agreement. The Servicing Agreement was also set to "terminate automatically at such time as the last Purchased Receivable being serviced by [KO] hereunder shall have been sold, paid or determined to be uncollectable." *Id.* at 4-8 §§ 2.1-2.3.

122672531.1

46. Before the Servicing Agreement expired by automatic termination, on February 7, 2022, Golden Pear and KO voluntarily entered into a new, valid and binding servicing agreement, which superseded the Servicing Agreement (the "Sub-Servicing Agreement"), discussed below.

**D.  The 2022 Sub-Servicing Agreement**

47. Golden Pear and KO entered into the Sub-Servicing Agreement three months after they had entered into the original Servicing Agreement. *See generally* **Ex. 3**. KO's Chief Executive Officer, Kim Vaugn Martin, personally returned an executed copy of the Sub-Servicing Agreement to Golden Pear.

48. The parties agreed that the Sub-Servicing Agreement is the "entire agreement and understanding among the parties hereto" with respect to the servicing of the Purchased Receivables, and the Sub-Servicing Agreement "supersede[s] any and all other oral or written agreements heretofore made with respect thereto," including the original Servicing Agreement. *Id.* at 8 § 4.2.

49. The Sub-Servicing Agreement again defined Golden Pear as the "Owner" of the Purchased Receivables. Unlike the original Servicing Agreement, the Sub-Servicing Agreement defined Plaintiff LitiCollect as the "Servicer." Also unlike the original Servicing Agreement, KO was defined as the "Sub Servicer." *See Id.* at 1.

50. Although IMD is not a party to the Sub-Servicing Agreement, upon information and belief, IMD was aware of the Sub-Servicing Agreement when Golden Pear, LitiCollect, and KO entered into it.

51. Under the Sub-Servicing Agreement, LitiCollect took over the collection services previously provided by KO, including managing, supervising, and directing collections of the Purchased Receivables. Section 1.1(d) of the Sub-Servicing Agreement broadly conferred authority on LitiCollect, providing that "Servicer is authorized to perform any servicing and collection activity it deems necessary to collect the balance due on the Purchased Receivables." *Id.* at 2-3 § 1.1(d).

52. Pursuant to Section 1.1(b), the only service that KO could now provide was negotiating and accepting requests for reductions of the amounts owned from law firms and plaintiffs ("Proceeds Reductions"). *Id.* at 2 § 1.1(b).

122672531.1

53.  KO, however, had the option to elect to perform this Proceeds Reduction service, subject to Golden Pear's approval and consent. If KO elected to negotiate the Proceeds Reductions, then KO's "right to negotiate and accept reductions shall be subject to final approval by and consent of Owner." *Id.* at 2 § 1.1(b).

54.  If KO elected to forgo negotiating a Proceeds Reduction, LitiCollect was authorized to do so on behalf of Golden Pear. *Id.* at 2 § 1.1(b).

55.  When LitiCollect (as Servicer) and KO (as the Sub-Servicer for elected Proceeds Reductions) received funds from a law firm or personal-injury plaintiff for a Purchased Receivable, both LitiCollect and KO were required to deposit the funds into Golden Pear's account when the funds were due. Funds are "due" when they are payable by the law firm or plaintiff following resolution of a personal injury claim. *Id.* at 3 § 1.1(e).

56.  Section 1.1(e) of the Sub-Servicing Agreement specifically provides,

> Servicer and Sub Servicer agree to: (i) when due, direct any and all Proceeds in an account of Owner to Owner's lockbox as set forth in the Purchase Agreement, and (ii) maintain with respect to each Purchased Receivable, complete and accurate books and records with respect to the servicing and collection of each Purchased Receivable.

*Id.* at 3 § 1.1(e).

57.  Section 1.1(d) of the Sub-Servicing Agreement required both LitiCollect and KO to exercise a degree of skill and care consistent with their internal standards and consistent with "best industry practice." *Id.* at 2-3 § 1.1(d).

58.  Under Section 2.2 of the Sub-Servicing Agreement, Golden Pear could terminate the Sub-Servicing Agreement with five days' notice "at any time in Owner's sole discretion." The Sub-Servicing Agreement does not define events of default and does not provide an opportunity to cure a default. *See id.* at 6 § 2.2; *see also id.*

59.  In the event of termination, Section 2.3 provides that KO and/or LitiCollect are required to provide Golden Pear with all records and required to "use [their] best efforts to cooperate fully in connection with any transfer of Servicing Obligations to a replacement servicer." *Id.* at 6 § 2.3.

122672531.1

60. Similarly, under Section 1.8 of the Sub-Servicing Agreement, in the event of a breach by KO, Golden Pear is expressly permitted to advise law firms that KO is no longer sub-servicing the Purchased Receivables and that proceeds for Purchased Receivables should be directed to Golden Pear or LitiCollect instead. *Id.* at 5-6 § 1.8.

61. Like the SPAs, the Sub-Servicing Agreement is governed by the laws of the State of New York pursuant to Section 4.8. *Id.* at 8 § 4.8.

## II.     KO AND IMD ACTED IN BAD FAITH TO BREACH THEIR RESPECTIVE AGREEMENTS

62. Under the original Servicing Agreement, and before the parties entered into the Sub-Servicing Agreement, KO was required to service the Purchased Receivables from November 5, 2021, to February 5, 2022. During that three-month period when the parties were governed by the original Servicing Agreement, Golden Pear learned that KO was not fulfilling its servicing obligations.

63. KO's inadequate services prompted Golden Pear to request that the parties enter into the new Sub-Servicing Agreement on February 5, 2022. From that date forward, LitiCollect was the primary servicer for all Purchased Receivables and KO was merely a sub-servicer for those Proceeds Reductions that KO elected to sub-service.

64. While LitiCollect was servicing the Purchased Receivables as Servicer under the Sub-Servicing Agreement, it became apparent that KO and IMD had sold Golden Pear multiple Purchased Receivables that KO or IMD had already collected from law firms and for which there was nothing left to collect.

65. Golden Pear and LitiCollect also learned that KO and IMD were withholding Golden Pear's funds for the Purchased Receivables. Both KO and IMD had received funds from law firms for the Purchased Receivables but did not promptly send those funds to Golden Pear as required by the Sub-Servicing Agreement and SPAs. In some cases, these funds were withheld for over a year.

66. After learning of this issue, LitiCollect began to regularly send KO and IMD emails requesting payment for Purchased Receivables where the law firms informed LitiCollect that KO or IMD had been paid directly, but Golden Pear had not received the funds.

- 11 -

122672531.1

67. On December 6, 2022, LitiCollect sent one of these emails requesting updates and payments for 15 Purchased Receivables that KO or IMD had improperly collected.

68. Three weeks later, on December 27, 2022, IMD responded. Despite being aware of the various agreements between the parties, IMD informed LitiCollect that, for three of the patients, IMD had received checks for a total of $4,500.00 but returned the checks to the law firms and requested payment be sent to KO, not LitiCollect or Golden Pear. For another $8,950.00, IMD stated that it had issued a check to KO, not LitiCollect or Golden Pear. IMD also admitted that it had "settled" several accounts for a total of $6,200 but intended to send payment to KO. Each of these actions interfered with the Sub-Servicing Agreement between KO, Golden Pear, and IMD, and openly violated the SPAs' requirement to send any received payments to Golden Pear, not KO.

69. On December 29, 2022, LitiCollect informed IMD that payment needed to be sent directly to LitiCollect or Golden Pear. Disregarding this notice, IMD and KO continued to withhold funds in violation of the parties' several agreements.

70. On June 30, 2023, LitiCollect sent KO and IMD a detailed spreadsheet listing every relevant case for which Golden Pear has purchased the Purchased Receivables, every case that had settled and for which IMD or KO were possibly withholding payment from Golden Pear, and every case that LitiCollect confirmed IMD had received payment but that IMD had failed to send to Golden Pear as required under the operative agreements.

71. On July 7, 2023, a representative of IMD responded that IMD would need additional time to respond on behalf of IMD and KO because the individual handling KO's matters had been on leave for two months and the replacement was training other employees rather than handling these cases.

72. Another week later, on July 13, 2023, IMD responded with "preliminary findings" that attempted to reconcile the accounts, but IMD still failed to remit payment to Golden Pear for the improperly sold and collected Purchased Receivables.

73. Golden Pear and LitiCollect also learned that KO and IMD had been negotiating Proceeds Reductions without informing Golden Pear, or LitiCollect, as required under Sub-Servicing Agreement, and without obtaining consent from Golden Pear in violation of Section

122672531.1

1.1(b)'s requirement that all Proceeds Reductions must be approved by Golden Pear.

74. On July 13, 2023, Golden Pear invoked the unilateral termination provision of the Sub-Servicing Agreement, Section 2.2. Golden Pear sent a notice of termination letter ("Notice of Termination") to KO and the President of KO/Chief Financial Officer of IMD, Mr. Shaolian.

75. In the Notice of Termination, Golden Pear explained that KO and IMD were improperly withholding funds from Golden Pear and as of July 13, 2023, Golden Pear had still not received payment for the Purchased Receivables that KO and IMD either improperly sold to Golden Pear after the matters had settled or after KO or IMD improperly collected funds for without sending those funds promptly to Golden Pear. Golden Pear advised KO and IMD that Golden Pear was terminating the Sub-Servicing Agreement with five days' notice.

76. After Golden Pear terminated KO's role as Sub-Servicer, KO and IMD continued to be uncooperative in reconciling the accounts for the Purchased Receivables, often making excuses based on the departure of employees.

77. On or about August 14, 2023, LitiCollect sent letters to each law firm who represented plaintiffs whose medical liens had been purchased by Golden Pear as Purchased Receivables ("Notice Letters"). In the Notice Letters, LitiCollect informed the law firms that LitiCollect was the Servicer and collector for the patients listed in each letter. LitiCollect did not list any patients for which Golden Pear was not the owner of the Accident Receivable.

78. On August 15, 2023, KO sent Golden Pear a demand letter threatening litigation if Golden Pear did not revoke its termination of the servicing relationship between Golden Pear and KO.

79. On August 21, 2023, KO sent LitiCollect a cease-and-desist letter, again threatening litigation, and demanding that LitiCollect cease servicing the Purchased Receivables.

80. Golden Pear and LitiCollect continued to adhere to the Sub-Servicing Agreement and denied KO's request for Golden Pear to withdraw its termination.

81. On August 22, 2023, IMD sent a letter to various law firms making two false representations. IMD falsely stated that LitiCollect and Golden Pear were "subcontracted . . . to provide us with case status services" and "we have dissolved that relationship" ("False

- 13 -

122672531.1

1 Representation Letters"). These statements are false because: Golden Pear owns the Purchased Receivables, Golden Pear is neither a subcontractor nor a servicer, and Golden Pear was the party who terminated the relationship with IMD and KO.

82. In the same False Representation Letters, IMD stated that it would reach out to the law firms for case updates and that reduction requests should be sent to IMD, implicitly instructing law firms not to communicate with LitiCollect or Golden Pear.

83. At least one law firm that received such a False Representation Letter refused to communicate with LitiCollect thereafter because IMD had instructed the law firm not to communicate with Golden Pear or LitiCollect.

84. Upon information and belief, KO has similarly instructed law firms not to communicate with Golden Pear and LitiCollect.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract Against KO—Sub-Servicing Agreement)

85. Plaintiffs reallege and incorporate by reference as though fully set forth herein the allegations contained in the above paragraphs.

86. The Sub-Servicing Agreement is a valid and existing contract between Golden Pear, LitiCollect, and KO.

87. The Sub-Servicing Agreement is a fully integrated agreement that supersedes the original Servicing Agreement.

88. Plaintiffs fully performed in accordance with the Sub-Servicing Agreement and Golden Pear properly terminated the Sub-Servicing Agreement in accordance with Section 2.2.

89. KO breached the Sub-Servicing Agreement, Section 1.1(b), by failing to seek Golden Pear's approval for Proceeds Reductions and by accepting reductions without Golden Pear's consent.

90. KO breached the Sub-Servicing Agreement by failing to exercise care consistent with its best industry practices under Section 1.1(d), including by failing to communicate with Golden Pear and LitiCollect.

122672531.1

91. KO breached the Sub-Servicing Agreement, Section 1.1(e), by withholding payments from Golden Pear for Purchased Receivables.

92. KO breached the Sub-Servicing Agreement, Section 2.3, by failing to cooperate in the transition away from KO's sub-services after Golden Pear terminated the Sub-Servicing Agreement.

93. As a direct and proximate cause of KO's breaches, Plaintiffs have suffered damages in excess of $75,000.00.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract Against KO and IMD—SPAs)

94. Plaintiffs reallege and incorporate by reference as though fully set forth herein the allegations contained in the above paragraphs.

95. The SPAs, and each of them, are valid and existing contracts between Golden Pear, on the one hand, and IMD or KO, on the other hand.

96. Golden Pear fully performed under the terms of each SPA.

97. IMD and KO breached the SPAs, Section 2, by demanding and receiving payments from law firms for the Purchased Receivables, and by failing to promptly forward all communications concerning Purchased Receivables.

98. IMD and KO breached the SPAs, Section 3(b), by selling Purchased Receivables for patients whose accounts IMD and KO had already collected.

99. IMD and KO breached the SPAs, Section 5, by failing to cooperate as reasonably necessary to permit Golden Pear to collect on the Purchased Receivables and by failing to promptly turn over payments received by KO and IMD to Golden Pear.

100. IMD further breached the SPAs, Sections 2, 4, and 5, by instructing law firms to communicate directly with IMD regardless of whether Golden Pear owned the Purchased Receivables.

101. As a direct and proximate cause of IMD's breaches, Golden Pear has suffered damages in excess of $75,000.00.

- 15 -

122672531.1

## THIRD CLAIM FOR RELIEF

**(Breach of Implied Covenant and Fair Dealing Against KO—Sub-Servicing Agreement)**

102. Plaintiffs reallege and incorporate by reference as though fully set forth herein the allegations contained in the above paragraphs.

103. The Sub-Servicing Agreement is a valid and existing contract between Golden Pear, LitiCollect, and KO.

104. Plaintiffs fully performed in accordance with the Sub-Servicing Agreement, and Golden Pear properly terminated the Sub-Servicing Agreement in accordance with Section 2.2.

105. KO breached its duty of good faith and fair dealing under the Sub-Servicing Agreement by refusing to accept termination of the Sub-Servicing Agreement, by withholding Golden Pear's funds despite the termination, and by instructing law firms not to communicate with Plaintiffs.

106. KO's actions were in bad faith with the intent to harm Plaintiffs.

107. As a direct and proximate cause of these breaches, Plaintiffs have suffered damages in excess of $75,000.00.

## FOURTH CLAIM FOR RELIEF

**(Breach of Implied Covenant and Fair Dealing Against KO and IMD—SPAs)**

108. Plaintiffs reallege and incorporate by reference as though fully set forth herein the allegations contained in the above paragraphs.

109. The SPAs, and each of them, are valid and existing contracts between Golden Pear, on the one hand, and IMD or KO, on the other hand.

110. Golden Pear has fully performed under the terms of each SPA.

111. KO and IMD breached their duty of good faith and fair dealing implicit in the SPAs by selling Purchased Receivables for patients whose accounts IMD and KO had already collected.

112. KO and IMD breached their duty of good faith and fair dealing implicit in the SPAs by repeatedly refusing to recognize Golden Pear as the owner of the Purchased Receivables and, instead, representing to non-parties that Golden Pear and/or LitiCollect were "sub-contractors" or merely funded the collection process.

122672531.1

113. KO and IMD reached their duty of good faith and fair dealing implicit in the SPAs by repeatedly requesting that law firms communicate directly with KO and IMD.

114. KO and IMD's actions were in bad faith with the intent to harm Plaintiffs.

115. As a direct and proximate cause of these breaches, Golden Pear has suffered damages in excess of $75,000.00.

## FIFTH CLAIM FOR RELIEF
### (Conversion Against KO and IMD)

116. Plaintiffs reallege and incorporate by reference as though fully set forth herein the allegations contained in the above paragraphs.

117. At all times relevant herein, Golden Pear had and continues to have a possessory interest in funds received in relation to Purchased Receivables because Golden Pear is the rightful owner of all rights, title, and interest in the Purchased Receivables.

118. KO and IMD have exercised dominion over Golden Pear's property by continuing to receive funds for Purchased Receivables and withholding those funds from Golden Pear.

119. KO and IMD's exercise of dominion has interfered with Golden Pear's rights under the SPAs and the law.

120. As a direct and proximate cause of KO and IMD's conversion, Golden Pear has suffered damages in excess of $75,000.00.

## SIXTH CLAIM FOR RELIEF
### (Tortious Interference with Contract Against KO—SPAs with IMD)

121. If KO is found not to be the alter ego of IMD, then Plaintiffs alternatively plead that KO tortious interfered with SPAs with IMD. Plaintiffs reallege and incorporate by reference as though fully set forth herein the allegations contained in the above paragraphs.

122. The SPAs between Golden Pear and IMD are valid and existing contracts.

123. KO is, and at all times relevant herein has been, aware of the SPAs between Golden Pear and IMD.

124. KO has intentionally and without justification encouraged IMD to breach the SPAs with Golden Pear by, upon information and belief, encouraging IMD to send payments directly to

KO.

125. As a direct and proximate cause of KO's interference, Golden Pear has suffered damages in excess of $75,000.00.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests the following relief:

A. an award of compensatory and consequential damages for KO's breaches of the Sub-Servicing Agreement in an amount to be determined at trial;

B. an award of compensatory and consequential damages for IMD's and KO's breaches of the SPAs in an amount to be determined at trial;

C. an award of punitive damages for IMD's and KO's breaches of the implied covenant of good faith and fair dealing and tortious conduct;

D. an award of compensatory and consequential damages for KO's and IMD's conversion of Golden Pear's property;

E. an award to Plaintiffs' cost of suit, including reasonable attorney's fees; and,

F. such other relief to which Plaintiffs may be entitled and the Court finds just and appropriate.

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues herein.

DATED this 13th day of October, 2023.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

By: */s/ Kristen L. Martini*
Kristen L. Martini, Nevada Bar No. 11272
Lucy Crow, Nevada Bar No. 15203
One East Liberty Street, Suite 300
Reno, Nevada 89501

*Attorneys for Plaintiffs*

122672531.1

# INDEX OF EXHIBITS

| Exhibit No. | Description | Page Nos. |
|---|---|---|
| 1 | October 15, 2021, Medical Accounts Receivable Master Purchase and Sale Agreement | 10 |
| 2 | November 5, 2021, Servicing Agreement | 11 |
| 3 | February 7, 2022, Servicing Agreement | 10 |

122672531.1